Affirmed in Part, Reversed and Remanded in Part, and Opinion
filed August 3, 2010.

 

In
The

Fourteenth
Court of Appeals



NO. 14-08-00795-CV



Transcontinental
Insurance Company, as Subrogee of The Estate of Reabon Jackson, Jr., Reabon
Drusila Jackson (a minor), Nettie Adams, and Donald Robinson; and SelenEr Love,
individually and as next friend of Reabon Drusila-karetta-Pashion Jackson, Appellants 

v.

Briggs
Equipment Trust and Genie Industries, Inc., Appellees 



On Appeal from
the 133rd District Court

Harris County, Texas

Trial Court
Cause No. 2004-44687



 

OPINION 

               We
review the trial court’s granting of three summary judgments dismissing
wrongful-death claims by a mother and her child and subrogation claims asserted
by a workers’ compensation carrier against the manufacturer and lessor of industrial
equipment.  We affirm the trial court’s judgment as to the mother’s claims
individually and as next friend of her child.  Based on fact issues precluding
summary judgment, we reverse the judgment as to all of the subrogation carrier’s
claims and remand these claims to the trial court.

I.                  
Factual and
Procedural Background

            The
Congregation Beth Yeshurun (“Congregation”) wished to replace lightbulbs in its
sanctuary.  Because these lightbulbs were approximately forty feet from the
floor, a lift was needed for the Congregation workers to replace the
lightbulbs.  Through Lakey Electric Company, defendant/appellee Briggs
Equipment Trust (“Briggs”) rented to the Congregation a Genie AWP 40 hydraulic
lift with personnel platform (“Lift”) as well as a “Super Straddle.”  The
Super Straddle is a frame-like base device on which the Lift can be mounted,
enabling the Lift to be used in locations where the floor is sloped or where
there are objects fixed to the floor, such as seats.  Defendant/appellee
Genie Industries, Inc. (“Genie”) manufactured the Lift and Super Straddle.

            Congregation
employee Reabon Jackson, Jr. (“Jackson”) was raised on the personnel platform
of the Lift while it was on the Super Straddle.  The Lift became unstable and
tilted over, causing Jackson to fall to his death and injuring another Congregation
employee, Donald Robinson.  

            The
day after Jackson’s death, September 5, 2002, Selener
Love, a woman with whom Jackson had not been ceremonially married, gave birth
to a daughter, whom Love alleges is Jackson’s child (“Child”).  Appellant/plaintiff
Transcontinental Insurance Company (“Transcontinental”), the Congregation’s
workers’ compensation carrier, paid benefits to Robinson, Jackson’s estate,
Nettie Adams (Jackson’s mother), and for the benefit of the Child.  Asserting
statutory and contractual subrogation, Transcontinental filed suit in the trial
court as subrogee of Robinson, Jackson’s estate, Jackson’s mother, and the
Child.  Transcontinental asserted negligence and strict-products-liability
claims against Briggs and Genie based on Jackson’s injuries and death and
Robinson’s injuries.  As to Jackson, these claims were based on (1) wrongful-death
claims in favor of the Child and Jackson’s mother and (2) a survival action in
favor of Jackson’s estate.  Transcontinental also alleged that
Briggs was liable under section 82.003 of the Texas Civil Practice and Remedies
Code, which governs the liability of nonmanufacturing sellers.


Love
intervened, contending that Jackson was her common-law spouse and that Jackson
was the Child’s biological father.  Love asserted wrongful-death and
loss-of-consortium claims on her own behalf and on the Child’s behalf.  Love
did not seek workers’ compensation death benefits as Jackson’s widow, but she
did seek and receive death benefits on behalf of the Child.  The hearing
officer in the compensation proceeding found that the Child is Jackson’s
daughter, without the benefit of any evidence of genetic testing.  

Jackson’s
mother, however, stated that she heard Jackson and Love talking about Love’s
pregnancy and that Jackson said he did not know whether he was the Child’s
father.  Because of this issue as to whether the Child is Jackson’s daughter,
Briggs and Genie (collectively, the “Defendants”) filed a motion for
court-ordered paternity testing.  In
the motion, the Defendants stated that Love, as next friend of the Child, had
the burden of proving by clear and convincing evidence that the Child is
Jackson’s daughter.  The Defendants asked the trial court to order genetic
testing by using Jackson’s blood sample from the Harris County Medical Examiner
and buccal swabs from Love and the Child.  The Defendants asserted that this
case included a proceeding to determine parentage under Chapter 160 of the
Texas Family Code, under which the trial court can order genetic testing.
Transcontinental opposed the motion, arguing, among other things, that Chapter
160 does not apply as asserted by the Defendants.  Transcontinental also
requested that, if testing were ordered, the Defendants waive any privileges
and that all results be submitted to Transcontinental’s counsel.  In a reply,
the Defendants asserted that they were not trying to engraft the requirements
of the Family Code onto the wrongful-death statute but that they were arguing
that genetic testing is allowed in cases such as this under Supreme Court of
Texas precedent.  The Defendants agreed to waive any privilege and requested
that all testing results be submitted to Transcontinental’s counsel.  

            The
trial court granted the Defendants’ motion and ordered genetic testing by
Identigene in August 2005.  However, the trial court added handwritten language
to the proposed order requiring that the test results be sealed, filed in
camera, and not be disclosed to any party absent a further order from the trial
court.  In October 2006, Identigene submitted a one-page report under seal to
the trial court in camera (“Identigene Report”).  The Defendants later filed an
unopposed motion to disclose the paternity-test results.  The trial court
granted the motion and ordered that the paternity-test results previously presented
to the trial court under seal be “produced to lead counsel of record for each party
in this case.”  The trial court, however, later refused to release the
paternity-test results.  Though the trial court allowed counsel to view the
results in camera at the courthouse, the trial court did not permit counsel or
the parties to make or retain copies of the test results.  Transcontinental
lodged objections to the test results.

            Shortly
before a July 9, 2007 trial setting, the Defendants filed a motion for
continuance.  The trial court called the case to trial on July 10, 2007.  At
first, the Defendants refused to announce “ready” unconditionally; instead,
they announced “ready” subject to the necessity of taking additional discovery
and subject to a motion for summary judgment that they wanted to file and have
heard before trial.  The trial court stated that, if the Defendants announced “ready”
unconditionally, then the trial court might recess the trial to allow the
parties to finish up a few matters, such as the completion of mediation,
additional discovery, and filing a motion for summary judgment.  The Defendants
then announced “ready,” and the trial court stated that the case was “in trial”
but that the trial would be recessed for a reasonable time for completion of
these matters.

            The
following month, the Defendants filed four motions for summary judgment.  In
the first (“First Motion”), the Defendants asserted a no-evidence motion
against most of the essential elements of Transcontinental’s claims and Love’s
claims.  In the second motion for summary judgment (“Second Motion”), Briggs
asserted traditional and no-evidence grounds, claiming that the
products-liability claims against Briggs fail under Chapter 82 of the Texas
Civil Practice and Remedies Code, which applies to products-liability actions. 
In the third motion (“Third Motion”), the Defendants sought a traditional and
no-evidence summary judgment, asserting that the genetic testing that was under
seal conclusively proved that the Child was not Jackson’s daughter and
therefore was not entitled to recover under the wrongful-death statute.  In the
fourth motion for summary judgment (“Fourth Motion”), the Defendants asserted
no-evidence grounds against Love’s claims, attacking the essential element that
Love be Jackson’s surviving spouse.           

            Transcontinental
filed a summary-judgment response with accompanying evidence, including
objections to the admission of the Identigene Report.  Love also filed a
summary-judgment response.  The Defendants filed various objections to Transcontinental’s
summary-judgment evidence.  

            All
four motions were submitted with oral argument on August 27, 2007.  At that
hearing, the trial court asked the parties to agree on a new submission date
for the motions.  However, the record reflects that the parties were unable to
agree and that the submission date for the motions was never re-set.  

            A
few months later, on October 9, 2007, the Defendants filed a reply in which
they attached two chain-of-custody affidavits.  They also noted that Identigene
had submitted an affidavit from Dr. Laura Gahn, together with chain-of-custody
documents, under seal to the court but that these documents had not been
produced to or reviewed by any party in the case, including the Defendants
(“Gahn Affidavit”).  The Gahn Affidavit was filed with the court under seal on
October 5, 2007.  Transcontinental objected that these materials had not been
provided to Transcontinental.  The trial court did not give the Defendants
leave to file any late summary-judgment evidence.

            The
trial court granted the first three summary-judgment motions and dismissed with
prejudice all claims asserted by Transcontinental and Love.  The trial court
denied the Fourth Motion.  Nowhere in the record did the trial court rule or
refuse to rule on any of the parties’ summary-judgment objections, and no party
sought a ruling on these objections or objected to any refusal to rule on these
objections.

            Transcontinental
and Love have both appealed.  On appeal, Transcontinental has filed an
unopposed motion to unseal the Identigene Report and the Gahn affidavit.

II.        Issues Presented

Love asserts in three issues that the trial court
erred in granting the three summary-judgment motions.  Transcontinental presents
five issues in which it challenges the three summary judgments granted in favor
of Briggs and Genie and the trial court’s failure to sustain objections to some
of the Defendants’ summary-judgment evidence.

III.      Standards of Review

In
a traditional motion for summary judgment, if the movant’s motion and
summary-judgment evidence facially establish its right to judgment as a matter
of law, the burden shifts to the nonmovant to raise a genuine, material fact
issue sufficient to defeat summary judgment.  M.D. Anderson Hosp. &
Tumor Inst. v. Willrich, 28 S.W.3d 22, 23 (Tex. 2000).  In reviewing a
no-evidence summary judgment, we ascertain whether the nonmovant pointed out
summary-judgment evidence raising a genuine issue of fact as to the essential
elements attacked in the no-evidence motion.   Johnson v. Brewer &
Pritchard, P.C., 73 S.W.3d 193, 206–08 (Tex. 2002).  In our de novo review
of a trial court’s summary judgment, we consider all the evidence in the light
most favorable to the nonmovant, crediting evidence favorable to the nonmovant
if reasonable jurors could, and disregarding contrary evidence unless reasonable
jurors could not.  Mack Trucks, Inc. v. Tamez, 206 S.W.3d 572, 582 (Tex.
2006).  The evidence raises a genuine issue of fact if reasonable and
fair-minded jurors could differ in their conclusions in light of all of the
summary-judgment evidence.  Goodyear Tire & Rubber Co. v. Mayes, 236
S.W.3d 754, 755 (Tex. 2007).  When, as in this case, the order granting summary
judgment does not specify the grounds upon which the trial court relied, we
must affirm the summary judgment if any of the independent summary-judgment
grounds is meritorious.  FM Props. Operating Co. v. City of Austin, 22
S.W.3d 868, 872 (Tex. 2000).  

IV.      Analysis

A.               
Did the trial court err in granting summary judgment
against Love’s claims?

Love challenges the trial court’s granting of the
three summary-judgment motions.  Though in all four motions the Defendants attacked
Love’s claims in some way, in the trial court, Love only filed a response in
opposition to the Fourth Motion, in which the Defendants asserted there is no
evidence that Love is Jackson’s surviving spouse.  The trial court denied the
Fourth Motion; however, in the First Motion, the Defendants asserted
no-evidence grounds challenging an essential element of at least one element of
all of Love’s claims.  Love’s failure to respond is fatal to her ability to
successfully assert on appeal that the trial court erred in granting the First Motion
as to her claims.  See Lee v. Palacios, No. 14-06-00428-CV, 2007 WL
2990277, at *2 (Tex. App.—Houston [14th Dist.] Oct. 11, 2007, pet. denied)
(mem. op.).  In response to the First Motion, Love did not point out
summary-judgment evidence raising a genuine issue of fact as to the essential
elements attacked in this no-evidence motion.  Therefore, the trial court did
not err in granting the First Motion as to Love’s claims.  See id.; Johnson
v. Brewer & Pritchard, P.C., 73 S.W.3d 193, 206–08 (Tex. 2002). 
Accordingly, we overrule Love’s second issue and affirm the trial court’s
judgment as to all of Love’s claims.

B.                
Did the trial court err in failing to sustain various
objections asserted by Transcontinental?

In its second issue, Transcontinental argues that the
trial court erred by failing to sustain objections that Transcontinental
asserted in the trial court against the affidavit of Terry Lakner, which the
Defendants filed in support of the Third Motion.  In its fourth issue,
Transcontinental asserts that the trial court erred by failing to sustain
objections that Transcontinental asserted in the trial court against the
Identigene Report and the Gahn Affidavit.  The record does not contain any
express ruling by the trial court on Transcontinental’s evidentiary
objections.  The trial court’s granting of the three summary-judgment motions is
not an implicit ruling on Transcontinental’s evidentiary objections.  See
Dolcefino v. Randolph, 19 S.W.3d 906, 926–27 (Tex. App.—Houston [14th
Dist.] 2000, pet. denied).  In sum, the trial court did not rule on
Transcontinental’s evidentiary objections, either expressly or implicitly, nor
did Transcontinental object to any refusal by the trial court to rule on these
objections.  Therefore, Transcontinental failed to preserve error on its second
and fourth issues.  See Tex. R.
App. P. 33.1(a); Choice v. Gibbs, 222 S.W.3d 832, 838 (Tex.
App.—Houston [14th Dist.] 2007, no pet.).  Accordingly, we overrule these issues.[1]

C.               
Did the trial court err in granting the First Motion as
to Transcontinetal’s claims?

In its first issue, Transcontinental argues that the
trial court erred in granting the First Motion, in which the Defendants
asserted that there is no evidence of duty, breach, or proximate cause with
respect to the negligence claims and no evidence of the following elements with
respect to the strict-products-liability claims:

·       
That Briggs designed, manufactured, marketed, or distributed the product;

·       
That Briggs placed the product into the stream of commerce;

·       
That the Lift was defectively designed so as to render it
unreasonably dangerous;

·       
That there was a safer alternative design available;

·       
That the allegedly defective product was a producing cause of the
alleged damages.

1.     
Is there a negligence duty?

In its summary-judgment response, Transcontinental
submitted an affidavit of Michael Mardis, Jackson’s cousin, in which Mardis
testifies as follows:

·       
Mardis was employed at the Congregation as a maintenance man and
was a witness to the accident in which Jackson was killed.

·       
Jackson was operating the Lift in the sanctuary to change the
lights.

·       
The day before the accident, two men from Briggs came out to the
Congregation and installed the Lift inside the building, right outside the
doors to the sanctuary.

·       
The two Briggs men would have seen the area where the Lift was
going to be used.  

·       
Briggs equipped the Lift with a straddle so that the Lift could
be placed over the seats in the sanctuary to operate.

·       
“We believed that since the green lights were on, it was proper
to operate the lift.  During the particular lift which ended with the lift
toppling with [Jackson] in it, the lift was in the straddle, the green lights
were on and the lift went up. After the lift started to slowly tilt, [Jackson]
said he was trying to bring the lift down, but that it wouldn’t come down.  As
the lift was moving, we were trying to hold it from tipping over, but could not
hold it.  The lift tipped over, throwing him to the ground and resulting in his
death.  Another Congregation employee, Don Robinson, injured his arm from the
lift falling over.”

Transcontinental submitted an affidavit from its
liability expert, Gary S. Nelson, in which Nelson testifies as follows:

·       
Briggs
had a responsibility of ordinary care to adequately train its customers in the
proper use and operation of the equipment provided for their use and explicitly
warn their customers regarding potential safety hazards associated with such
equipment.  Regarding the Lift and Super Straddle at issue in this case, such
warnings would include a warning to never operate the Lift when installed in
the Super Straddle without all four outriggers installed in the straddle base.

·       
Briggs’s
responsibility to adequately train its customers is also based on “section 5.6
in ANSI A92.3, titled ‘American National Standard for Manually Propelled
Elevating Aerial Platforms.’”  

Transcontinental’s summary-judgment evidence also
includes a transcript of an interview of Mardis in which Mardis states that,
the day before the accident, a man working for Briggs had set up the Lift and Super
Straddle outside of the sanctuary but that Congregation employees set up this
equipment in the sanctuary on the day of the accident.  There is also a report
in which the following is stated:

·       
Bryan with Briggs assembled the Lift, and all the lights were on
even though the outriggers were not installed.  

·       
Without the outriggers installed, the Lift was not supposed to
operate; however, it did operate without the outriggers being installed, and
Bryan with Briggs “felt comfortable with this.”   

·       
Bryan with Briggs said that it was “okay” not to use the
outriggers.

            Transcontinental
also submitted evidence showing that Briggs rented the Lift and Super Straddle
to the Congregation on Lakey’s account and delivered this equipment to the
Congregation on the day before the accident.  Transcontinental provided
deposition testimony from Richard Curtin, a Product Safety Manager for Genie’s
parent company.  Curtin testified as follows:

·       
Curtin
is familiar with a Genie training guide that recites responsibilities based on
“ANSI A92.3.”

·       
That
guide states that manufacturers of aerial platforms have the responsibility to
provide the operational maintenance instructions with regard to aerial
platforms.

·       
Manufacturers
of aerial platforms have the responsibility to identify the hazards associated
with operating the aerial platforms.

·       
The
guide and the ANSI standard state that Dealers have the responsibility to offer
appropriate training and familiarization to users and operators regarding all
aspects of aerial-platform operation and safety.  

·       
Owners
of aerial platforms have the same responsibility.

·       
Genie
provides training courses to rental companies such as Briggs so that Briggs can
train its employees on how to train operators of the equipment.

·       
This
training of the operators on how to use the Lift and Super Straddle includes a
classroom component in which a videotape is played, a review of the operator’s
manual for the Lift and for the Super Straddle, a test at the end of the
classroom session, hands-on training, including pre-operation inspection and a
review of the functional testing of the equipment, a discussion of workplace
inspections and safety, and a question-and-answer session. 

Bobby
Wilking, a regional sales manager for Genie, testified, among other things as
follows:

·       
ANSI
A92.3, section 5.6 states that, “Whenever a dealer directs or authorizes an
individual to operate an aerial platform, the dealer shall ensure the
individual has been trained under the direction of a qualified person in
[accordance] with the manufacturer’s operator and maintenance manual and
requirements listed in Section 8 before operating the aerial platform.”  

·       
Briggs
qualifies as a “dealer” under this standard.  

·       
This
standard requires that the dealer ensure that the individual has been trained
under the direction of a qualified person.  

·       
That
is the industry standard as to the training that should be provided by the
dealer.

In
his report, Curtin states that Genie manufactured the Lift and Super Straddle
involved in this accident and that Briggs owned and maintained this equipment. 


The
summary-judgment evidence contains a statement by William Purcell (Briggs’s
retained expert) that Briggs provided “hands-on” training to Congregation
employees when the Lift and Super Straddle were delivered.  

Under
the applicable standard of review, we conclude that summary-judgment evidence
raises fact issues as to the existence of facts and circumstances under which Briggs
and Genie owe a negligence duty.  See Gonzales v. Caterpillar Tractor Co.,
S.W.2d 867, 871–72 (Tex. 1978) (holding that manufacturer has duty to exercise
ordinary care in design, preparation, manufacture, and sale of product); Colonial
Sav. Ass’n v. Taylor, 544 S.W.2d 116, 119 (Tex. 1976) (holding that one who
voluntarily undertakes an affirmative course of action for the benefit of
another has a duty to exercise reasonable care that the other’s person will not
be injured thereby); Sico N. Am. v. Willis,  No. 14-08-00158-CV, 2009 WL
3365856, at *8 (Tex. App.—Houston [14th Dist.] Sept. 10, 2009, no pet.) (mem.
op.) (addressing negligence duty owed by product manufacturer).

2.     
Is there any evidence of breach of a negligence duty?

            The summary-judgment evidence contains
the following opinions from Nelson:

·       
Genie
failed to comply with the best practice as advocated by the safety literature
for decades to interlock the hydraulic lift start mechanism so as not to
operate without the installation and use of outriggers (including when utilized
with the Super Straddle accessory).  Compliance with such a design feature is
especially warranted when potentially dangerous equipment will foreseeably be
used by a “weekend” user, such as those who occasionally rent or lease such
equipment, and who have little experience in the use of such equipment.

·       
When
the Super Straddle was designed, manufactured, marketed, distributed, and sold,
Genie knew or should have known of the readily available state-of-the-art safe
design principles and guidelines that would have effectively eliminated the
hazard associated with the use of the Lift without the outriggers installed in
the straddle unit base, as dictated by the ordinary application of generally
known design criteria, as well as the recommendations and provisions of the
relevant authoritative safety literature. 

·       
When
the Super Straddle was designed, manufactured, marketed, distributed, and sold,
Genie knew or should have known of various reasonably available, significantly
safer alternative designs that would have prevented or significantly reduced
the risk of the type of mishap or injury that occurred to Jackson and Robinson
in this case and these alternative available designs would have been both
economically and technically feasible without impairing the Super Straddle’s
utility.  

·       
The
primary unsafe condition or causative factor related to the incident in
question was the lack of an electrical interlock system incorporated on the
Genie Super Straddle unit to work in combination with the interlock system on
the Lift, that would prevent the operation of the Lift (raising the mast and
personnel platform) without all four outriggers properly installed in the Super
Straddle base.  

·       
When
the Lift is installed on the Super Straddle platform, the Lift is fully
operational (enabled for raising the mast and attached personnel platform)
whether or not the outriggers are installed on the straddle unit base.  The
mechanical interlock incorporated into the design of the Super Straddle unit
only prevents the initial raising of the straddle platform if the
outriggers are not installed.  Once the straddle platform is raised past the
mechanical block (only 1 to 2 inches), the straddle platform can then be raised
the remainder of the height and moved around without the outriggers installed. 
However, at no time does the mechanical interlock prevent the operation of the Lift,
allowing the mast and attached personnel platform to be raised at any time
whether the outriggers are installed in the straddle base or not.  Essentially,
the mechanical interlock is useless in preventing the primary hazard associated
with this equipment, which is the raising of the Lift’s mast without the
outriggers installed.

·       
Genie
failed to design, manufacture, market, and distribute the Super Straddle to be
free of recognized and reasonably foreseeable hazards likely to result in death
or severe injury.  

·       
Briggs
failed to adequately train Jackson and Robinson in the proper use and operation
of the Super Straddle and failed to warn them of the dangers of operating the Lift
without all four outriggers installed in the straddle base.  

The
summary-judgment evidence contains a statement by William Purcell, an expert
retained by Briggs, that Briggs provided “hands-on” training to Congregation
employees when the Lift and Super Straddle were delivered.  

 Considering
all the summary-judgment evidence in the light most favorable to
Transcontinental, crediting evidence favorable to Transcontinental if
reasonable jurors could, and disregarding contrary evidence unless reasonable
jurors could not, we conclude that reaonable and fair-minded jurors could
differ in their conclusions as to whether Genie and Briggs breached their negligence
duties.  There is a genuine issue of fact as to the element of breach of
negligence duty.  See Gonzales, 571 S.W.2d at 871–72 (concluding there
was fact issue in negligence claim against product manufacturer); Sico N.
Am.,  2009 WL 3365856, at *8-10 (same).

3.     
 Is there any evidence of causation regarding the negligence
claims?

Mardis, Jackson’s co-worker and cousin who witnessed
the accident in which Jackson was killed, testified as follows:

·       
The day before the accident, two men from Briggs came out to the
Congregation and installed the Lift inside the building, outside the doors to
the sanctuary.  Briggs equipped the Lift with a straddle so that the Lift could
be placed over the seats in the sanctuary to operate.

·       
“We believed that since the green lights were on, it was proper
to operate the lift.  During the particular lift which ended with the lift
toppling with [Jackson] in it, the lift was in the straddle, the green lights
were on and the lift went up. After the lift started to slowly tilt, [Jackson]
said he was trying to bring the lift down, but that it wouldn’t come down.  As
the lift was moving, we were trying to hold it from tipping over, but could not
hold it.  The lift tipped over, throwing him to the ground and resulting in his
death.  Another Congregation employee, Don Robinson, injured his arm from the
lift falling over.”

Nelson, Transcontinental’s liability expert, testified
as follows:

·       
Had
outriggers been used on the Lift when the platform was raised above the floor
level, it would not have become unstable and tipped over.

·       
When
the Super Straddle was designed, manufactured, fabricated, marketed,
distributed, and sold, Genie failed to comply with ordinary good practice and
available design principles and guidelines, incorporated and in use on its own
lift equipment, in addition to technology being used by its competitors on the
same or similar equipment, pertaining to the prevention of the lift mast being
raised without outriggers installed in the straddle base, which would have
effectively minimized the tip-over hazard, and with a high degree of certainty,
prevented the incident.  

·       
When
the Super Straddle was designed, manufactured, fabricated, marketed,
distributed, and sold, Genie failed to use a reasonably available, economically
and technically feasible, significantly safer, alternative design that would
have prevented or significantly reduced the risk of the type of mishap and
injury that occurred without impairing the Super Straddle’s utility.  

The record contains a statement that, when the Lift
and Super Straddle were delivered, an employee of Briggs said that it was
“okay” not to use the outriggers.  The record also contains evidence that the
Congregation employees did not use outriggers and that their failure to do so
caused the Lift to tip over resulting in Jackson’s injuries and death and
Robinson’s injuries, which are the basis of Transcontinental’s claims.  

Under
the applicable standard of review, we conclude that there are genuine fact issues
as to the causation element of Transcontinental’s negligence claims.  See
Mott v. Red’s Safe and Lock Servs., Inc., 249 S.W.3d 90, 96–97 (Tex.
App.—Houston [1st Dist.] 2007, no pet.) (finding genuine fact issue as to
causation element of negligence claim).

4.     
Is there any evidence that Briggs placed the product in the
stream of commerce?

In the First Motion, Briggs asserted there is no
evidence that Briggs designed, manufactured, marketed, or distributed the
product and no evidence that it placed the product in the stream of commerce. 
The text of section 402A of the Restatement (Second) of Torts suggests that
strict products liability is limited to “sellers” who are “engaged in the
business of selling such a product.”  See Restatement (Second) of Torts § 402A (1965); New Tex. Auto
Auction Servs., v. Gomez de Hernandez, 249 S.W.3d 400, 403 (Tex. 2008).  Texas
courts, however, have long applied strict products liability more broadly.  See
New Tex. Auto Auction Servs., 249 S.W.3d at 403.  Lessors of products
are subject to strict liability claims as long as they placed the product in
question into the stream of commerce.  See id.; Rourke v. Garza, 530
S.W.2d 794, 800 (Tex. 1975), abrogated on other grounds by, Ford
Motor Co. v. Ledesma, 242 S.W.3d 32, 45–46 (Tex. 2007).

The
summary-judgment evidence shows that Briggs rented the Lift and Super Straddle
to the Congregation on Lakey’s account and that Briggs delivered this equipment
to the Congregation on the day before Jackson’s fatal fall.  Under the
applicable standard of review, there is a genuine fact issue (1) as to whether Briggs
designed, manufactured, marketed, or distributed the product and (2) as to
whether Briggs placed the Lift and Super Straddle in the stream of commerce.  See
Rourke, 530 S.W.2d at 800.

5.     
Is there any evidence that the product was defectively designed
so as to render it unreasonably dangerous and that a safer alternative
design was available?

A strict-products-liability
claimant alleging design defect must prove that the
product was defectively designed so as to render it unreasonably dangerous.  See
Timpte Indus. v. Gish, 286 S.W.3d 306, 311 (Tex. 2009).  To make this determination, Texas
courts apply a risk-utility analysis that requires consideration of the
following factors:

(1) the utility of the product to the user and to the public as a
whole weighed against the gravity and likelihood of injury from its use; (2)
the availability of a substitute product which would meet the same need and not
be unsafe or unreasonably expensive; (3) the manufacturer’s ability to
eliminate the unsafe character of the product without seriously impairing its
usefulness or significantly increasing its costs; (4) the user’s anticipated
awareness of the dangers inherent in the product and their avoidability because
of general public knowledge of the obvious condition of the product, or of the
existence of suitable warnings or instructions; and (5) the expectations of the
ordinary consumer.

Id.  The risk-utility analysis does not
operate in a vacuum, but rather in the context of the product’s intended use
and its intended users.  Id. at 312.  Although whether a product is
defective is generally a question of fact, in the appropriate case, it may be
determined as a matter of law.  Id.  Related to this element is the
existence of a safer alternative design.  See
Tex. Civ. Prac. & Rem. Code Ann.
§ 82.005(a)(1) (Vernon 2005); Timpte Indus., 286 S.W.3d at 311.  In
the First Motion, the Defendants asserted that there is no evidence (1) the product was defectively designed and unreasonably dangerous and
(2) a safer alternative design was available.

Nelson, Transcontinental’s expert,
testified that the Lift and Super Straddle were defective and unreasonably
dangerous because they were not sold with an interlock incorporated into their
design that would prevent the hydraulic personnel platform from being raised
without the use of outriggers necessary to keep the Lift stable and prevent
turnover.  Nelson stated that the product was defective due to the lack of an
electrical interlock system incorporated on the Super Straddle unit to work in
combination with the interlock system on the Lift, that would prevent the
operation of the Lift (raising the mast and personnel platform) without all
four outriggers properly installed in the Super Straddle base.  Nelson observed
that, as designed, when the Lift is installed on the Super Straddle platform,
the Lift is fully operational (enabled for raising the mast and attached
personnel platform), even if the outriggers are not installed on the straddle
unit base.  

The
mechanical interlock incorporated into the design of the Super Straddle unit
only prevents the initial raising of the straddle platform if the
outriggers are not installed.  Once the straddle platform is raised past the
mechanical block (only 1 to 2 inches), the straddle platform can then be raised
the remainder of the height and moved around without the outriggers installed. 
However, at no time does the mechanical interlock prevent the operation of the Lift,
allowing the mast and attached personnel platform to be raised at any time
whether or not the outriggers are installed in the straddle base.  In Nelson’s
opinion, the mechanical interlock is useless in preventing the primary hazard
associated with this equipment, which is the raising of the Lift’s mast without
the outriggers installed. 

According
to Nelson, when the product in question was designed, manufactured, marketed,
distributed, and sold, there were various reasonably available, significantly
safer alternative designs that would have prevented or significantly reduced
the risk of the type of mishap and injuries that Jackson and Robinson experienced,
and these alternative available designs would have been both economically and
technically feasible without impairing the Super Straddle’s utility.  Nelson
concluded that when the Super Straddle was designed, Genie failed to comply
with available design principles and guidelines used on its own lift equipment,
in addition to technology being used by its competitors on the same or similar
equipment, pertaining to the prevention of the Lift mast being raised without
outriggers installed in the straddle base.  

Nelson
noted that the Lift has an electrical interlock system that, when no Super
Straddle is being used, prevents the raising of the mast (and attached
personnel platform) unless all four outriggers are properly installed.  Nelson
observed, however, that when the Lift is used with the Super Straddle, this
electrical interlock system allows the mast and platform to be raised even if
none of the outriggers are installed.  Nelson faulted the product design for
failing to physically safeguard the tip-over hazard by incorporating into the
design of the Super Straddle the same type of electrical interlock system as used
in the design of the Lift.  Nelson stated that such an interlock system in the
Super Straddle would then be “plugged into” the interlock system in the Lift,
by socket plug or other means, thus preventing the operation of the Lift unless
the four outriggers were properly installed in the straddle unit base.  Nelson
noted that he had inspected a “JLG 30AM AccessMaster Push-Around Personnel
Lift” and “JLG Straddle Extension” and that these products showed the
incorporation of this type of system, which does not allow the Lift to be
operated unless all outriggers are installed in the straddle base.  Nelson
concluded that the availability of such a system from a competing manufacturer
shows the technical feasibility of incorporating such a design into Genie’s
products.  

At
his deposition, Curtin testified that the Lift has a panel of four green
lights, one for each outrigger.  As each outrigger is properly installed in the
unit, the corresponding green light is activated.  If all four green lights are
not activated, then the personnel platform cannot be raised.  However, Curtin
testified that, if the outriggers are not being used and the Lift is connected
to the Super Straddle, the green lights will be activated.  

Considering
all the summary-judgment evidence in the light most favorable to
Transcontinental, crediting evidence favorable to Transcontinental if
reasonable jurors could, and disregarding contrary evidence unless reasonable
jurors could not, we conclude that reasonable and fair-minded jurors could
differ in their conclusions as to whether (1) the
product was defectively designed so as to render it unreasonably dangerous and (2) a safer alternative design was available.  A
genuine issue of fact exists as to these elements.  See Gen. Motors Corp. v.
Sanchez, 997 S.W.2d 584, 588–92 (Tex. 1999) (concluding there was fact
issue as to existence of safer alternative design); Gonzales, 571 S.W.2d
at 869–71 (concluding there was fact issue as to existence of design defect). 

6.     
Is there any evidence that the allegedly defective product was a
producing cause of the alleged damages?

The Defendants also asserted
that there is no evidence that the allegedly defective product was
a producing cause of the alleged damages.  A producing cause is a cause that was “a substantial factor in
bringing about an injury, and without which the injury would not have
occurred.” Ledesma, 242 S.W.3d at 42.  

Nelson, Transcontinental’s liability expert,
testified as follows:

·       
Had
the Lift been equipped with an interlock incorporated into its design that
would prevent it from being raised without the use of outriggers in the Super
Straddle, with a high degree of engineering and scientific certainty, the Lift
would not have tipped over, and Jackson would not have been injured.   

·       
When
the Super Straddle was designed, manufactured, marketed, distributed, and sold,
Genie failed to comply with available design principles and guidelines, used on
its own lift equipment, in addition to technology being used by its competitors
on the same or similar equipment, pertaining to the prevention of the Lift mast
being raised without outriggers installed in the straddle base, which would
have effectively minimized the tip-over hazard, and with a high degree of
certainty, prevented the incident.  

Under the applicable standard of review,
we conclude that there are genuine fact issues as to whether the allegedly
defective product was a producing cause of the alleged damages. See Shipley
v. Holt Tex., Ltd., No. 2-09-122-CV, 2010 WL 1999016, at *5–6 (Tex.
App.—Fort Worth May 20, 2010, no pet. h.) (mem. op.) (finding fact issue as to whether
design defect was producing cause of personal injury); Int’l. Harvester Co.
v. Zavala, 623 S.W.2d 699, 707 (Tex. Civ. App.—Houston [1st Dist.] 1981, writ
ref’d n.r.e.) (finding fact issue as to whether design defect was producing
cause of personal injury).

In the trial court, the Defendants asserted numerous objections
against Transcontinental’s summary-judgment evidence.  On appeal, the
Defendants devote most of their appellate briefing regarding the First Motion
to their evidentiary objections.  However, the record does not contain any
express ruling by the trial court on Transcontinental’s evidentiary
objections.  The trial court’s granting of the three summary-judgment motions
was not an implicit ruling on Transcontinental’s evidentiary objections.  See
Dolcefino, 19 S.W.3d at 926–27.  The trial court did not rule on any of the
Defendants’ evidentiary objections, either expressly or implicitly, nor did the
Defendants object to any refusal by the trial court to rule on these
objections.  Therefore, the Defendants waived all of the objections to defects
in form, as to which a trial court ruling is required.  See id.; Choice,
222 S.W.3d at 838.  Most of the objections that the Defendants urge in their
appellate brief have been waived.  

Conclusory statements cannot raise a fact issue, even
if they drew no objection, and the summary-judgment evidence does contain some
conclusory statements.  Nonetheless, even ignoring all the conclusory statements
and other summary-judgment evidence that has a defect in substance, the
remaining evidence raises a genuine fact issue as to all elements challenged in
the First Motion.  Accordingly, we conclude that, as to Transcontinental, the trial
court erred in granting the First Motion, and we sustain Transcontinental’s
first issue to that extent.

D.               
Did the trial court err in granting the Second Motion
as to Transcontinetal’s claims?

In its third issue, Transcontinental asserts that the
trial court erred in granting the Second Motion.  In that motion, Briggs
asserted that it is a “seller” as defined in chapter 82 of the Texas Civil
Practice and Remedies Code, entitled “Products Liability.”  See Tex. Civ. Prac. & Rem. Code Ann. §
82.001(1) (Vernon 2005) (defining a “seller” as “a person who is engaged in the
business of distributing or otherwise placing, for any commercial purpose, in
the stream of commerce for use or consumption a product or any component part
thereof”).  Briggs asserted that section 82.003 of the Texas Civil Practice and
Remedies Code applies.  See Tex.
Civ. Prac. & Rem. Code Ann. § 82.003 (Vernon Supp 2010).  This provision,
entitled “Liability of Nonmanufacturing Sellers,” states in pertinent part:

(a) A seller that did not
manufacture a product is not liable for harm caused to the claimant by that
product unless the claimant proves:

. . .

(3) that the seller
installed the product, or had the product installed, on another product and the
claimant’s harm resulted from the product’s installation onto the assembled
product;

(4) that:

(A) the seller
exercised substantial control over the content of a warning or instruction that
accompanied the product;

(B) the warning or instruction was
inadequate;  and

(C) the claimant’s
harm resulted from the inadequacy of the warning or instruction;

(5) that:

(A) the seller made
an express factual representation about an aspect of the product;

(B) the representation was
incorrect;

(C) the claimant
relied on the representation in obtaining or using the product;  and

(D) if the aspect
of the product had been as represented, the claimant would not have been harmed
by the product or would not have suffered the same degree of harm;

(6) that:

(A) the seller
actually knew of a defect to the product at the time the seller supplied the
product; and

(B) the claimant's harm resulted
from the defect . . . .

Id.  Asserting both
traditional and no-evidence grounds, Briggs claimed that as a matter of law, no
part of section 82.003(a) applies in this case and therefore Briggs is entitled
to summary judgment.  We presume for the sake of argument that the evidence attached
to the Second Motion facially established Briggs’s right to judgment as a
matter of law, thus shifting the burden to Transcontinental to raise a genuine,
material fact issue sufficient to defeat the traditional grounds in the Second
Motion.  We also presume for the sake of argument that, even though Briggs first
must show that it is a “seller” to take advantage of section 82.003, Briggs
nonetheless may assert no-evidence grounds as to whether any of the seven scenarios
listed in section 82.003(a) apply in this case.  On appeal, Transcontinental
assigns error only as to the four subsections listed above, claiming that the
summary-judgment evidence raises a fact issue as to these four situations.  

As to subsection (a)(3), Mardis testified that the
day before the accident, two men from Briggs came out to the Congregation and
installed the Lift inside the Congregation’s building, equipping the Lift with
the Super Straddle. The summary-judgment evidence also includes a statement
that according to Donald Robinson and David Warfield (both Congregation
employees), the Lift and Super Straddle were delivered to the Congregation and
assembled by Briggs.   As discussed above, the record contains evidence that,
when the Lift was attached to the Super Straddle, the product was defective due
to the lack of an electrical interlock system incorporated on the Genie Super
Straddle unit to work in combination with the interlock system on the Lift that
would prevent the operation of the Lift (raising the mast and personnel platform)
without all four outriggers properly installed in the Super Straddle base.  Under
the applicable standard of review, we conclude that there are genuine fact issues
as to whether Briggs installed the product (or had the product installed) on another
product and the harm resulted from the product’s installation onto the
assembled product.  Therefore, the trial court erred in granting the Second
Motion as to subsection (a)(3) of section 82.003. See Tex. Civ. Prac. & Rem. Code Ann. §
82.003(a)(3).

As to subsection (a)(4),  according to a report in
the summary-judgment evidence, (1) a Briggs employee assembled the Lift; (2) without
the outriggers installed, the Lift was not supposed to operate, but the Lift
did operate without the outriggers being installed; and (3) the Briggs employee
“felt comfortable with this” and said that it was “okay” not to use the
outriggers.  Under the applicable standard of review, we conclude that there are
genuine fact issues as to whether (A) Briggs exercised substantial control over
the content of a warning or instruction that accompanied the product; (B) the
warning or instruction was inadequate; and (C) the claimant’s harm resulted
from the inadequacy of the warning or instruction.  Therefore, the trial court
erred in granting the Second Motion as to subsection (a)(4) of section 82.003. 
See id. § 82.003(a)(4).

As to subsection (a)(5), according to a report in the
summary-judgment evidence, a Briggs employee assembled the Lift and told
Congregation employees that it was “okay” not to use the outriggers.  Under the
applicable standard of review, we conclude that there are genuine fact issues
as to whether (A) Briggs made an express factual representation about an aspect
of the product; (B) the representation was incorrect; (C) the claimant relied
on the representation in obtaining or using the product; and (D) if the aspect
of the product had been as represented, the claimant would not have been harmed
by the product or would not have suffered the same degree of harm.  Therefore,
the trial court erred in granting the Second Motion as to subsection (a)(5) of
section 82.003.  See id. § 82.003(a)(5).

To satisfy subsection (a)(6), Transcontinental has to
prove that Briggs actually knew of a defect to the product when Briggs supplied
the product.  The only evidence that Transcontinental cites as raising a fact
issue in this regard is a statement by Nelson (Transcontinental’s liability expert)
that “through the prudent application of reasonable and competent care in the
operation of their business [sic] to know the operational characteristics of
the equipment that they rent or lease, and their obligation and practice to
instruct persons unfamiliar with such equipment regarding its safe use, Briggs
knew that the installation of the outrigger extension frame would, under
reasonably forseeable circumstances, bypass the outrigger interlock safety
feature and allow the lift platform to be raised without the use of
outriggers.”  Under the applicable standard of review, we conclude that there are
no genuine fact issues as to whether Briggs actually knew of a defect to the
product when Briggs supplied the product.  Because the evidence does not raise
a genuine fact issue in this regard, the trial court did not err in granting
the Second Motion as to subsection (a)(6) of section 82.003.  See id.
§ 82.003(a)(6).  However, because fact issues exist as to the three subsections
discussed above, Briggs was not entitled to judgment as a matter of law against
Transcontinental, and the trial court erred in granting the Second Motion.[2] Accordingly,
we sustain the third issue as to Transcontinental’s claims.

E.                
Should this court grant Transcontinental’s unopposed
motion to unseal the Identigene Report and the Gahn Affidavit?

On its own motion and without following the procedures
described in Texas Rule of Civil Procedure 76a, entitled “Sealing Court Records,”
the trial court ordered the Identigene Report to be submitted to the court
under seal.  See Tex. R. Civ. P.
76a (stating that “no court order or opinion
issued in the adjudication of a case may be sealed. Other court records . . . are
presumed to be open to the general public and may be sealed only upon a showing
of all of the following . . . .”).  Identigene submitted the Gahn
Affidavit to the trial court under seal.  Both documents remain under seal on
appeal in this court.  Transcontinental has filed a motion to unseal these
documents.  Neither the Defendants nor Love, the Child’s mother, oppose this
motion.  Under these circumstances, we grant the motion and order the documents
unsealed.

F.                
Did the trial court err in granting the Third Motion as
to Transcontinetal’s claims?

In its fifth issue, Transcontinental asserts that the
trial court erred in granting the Third Motion.  In that motion, the Defendants
sought partial summary judgment, arguing the Child cannot recover under the
wrongful-death statute because, as a matter of law, the Child is not Jackson’s
biological daughter.  The Defendants sought this relief under a traditional
ground based on the Identigene Report and under a no-evidence ground.  We
presume for the sake of this analysis that Love and Jackson were not married
(either ceremonially or by common-law marriage).

The parties also have raised an issue as to whether chapter
160 of the Texas Family Code (The Uniform Parentage Act) applies to the
determination of whether an alleged wrongful-death beneficiary is the biological
child of the decedent.  See Tex.
Fam. Code Ann. § 160.001, et seq. (Vernon 2008).  In Garza v.
Maverick Market, Inc., the Supreme Court of Texas held that a predecessor
statute to chapter 160 did not apply to the determination of whether an alleged
wrongful-death beneficiary is the biological child of the decedent.  See
768 S.W.2d 273, 275 (Tex. 1989).  After examining the relevant text from the
Family Code, the Garza court concluded that the Family Code procedures
were intended for different purposes and were not designed or intended to apply
in wrongful-death actions.  See id.  Though the Uniform Parentage Act is
different in many ways from the predecessor statute in Garza, we see no
language in chapter 160 that would justify a departure from the Garza
holding or that would signal an intent by the legislature that chapter 160
apply in wrongful-death actions.  See Tex.
Fam. Code Ann. § 160.001, et seq.  Therefore, we hold that chapter
160 does not apply to the determination in this case of whether the Child is
Jackson’s biological daughter.  See id.; Cooper Tire & Rubber Co.
v. Mendez, 155 S.W.3d 382, 415 (Tex. App.—El Paso 2004) (applying Garza
standard and not chapter 160 to determination of whether the child was
decedent’s biological daughter and therefore a beneficiary under the
wrongful-death statute), rev’d on other grounds, 204 S.W.3d 797 (Tex.
2006).

Under Garza, to recover under the
wrongful-death statute, the Child need not have been shown to be Jackson’s
daughter in a proceeding under another statute.  See Garza, 768 S.W.2d
at 275.  If paternity is questioned in a wrongful-death action, the putative
child of the decedent has the burden of proving a filial relationship with the decedent
by clear and convincing evidence.  See id. at 275–76.  In making this
determination, blood tests, if available, may help
show the alleged father’s paternity.  See id. at 276.  Evidence of
physical resemblance of the child to the alleged father, either by photographs
of the child and father, or by the offer of the child itself, is also
admissible to determine paternity.  See id.  In addition, prior
statements by the alleged father that he was the father of the child or other
admissions by him bearing on his relationship to the child may be considered.  See
id.  A trial court also can consider evidence of periods of conception and
gestation.  See id.  Whether some or all of this evidence would rise to
the level of clear and convincing evidence in a particular case cannot be
predicted.  See id.  

As to the Defendants’ traditional motion for summary
judgment, we conclude that their motion and summary-judgment evidence did not facially
establish their right to judgment as a matter of law.  See M.D.
Anderson Hosp. & Tumor Inst., 28 S.W.3d at 23.  The Third Motion was
submitted to the trial court on August 27, 2007.  The only timely filed evidence
submitted by the Defendants is the one-page Identigene Report.  Though this
report states that Jackson is excluded as being the Child’s biological father
and that there is a 0% “Probability of Paternity” based on this testing, this
report does not explain the nature of testing or how it was performed.  In
addition, the genetic testing was performed more than four years after
Jackson’s death, and the Identigene Report does not explain any of the
following: (1) the nature of the sample purportedly taken from Jackson, (2) the
chain of custody of that sample, (3) any reasons to believe the sample really
is from Jackson, (4) under what conditions the sample was maintained over the
years since Jackson’s death, and (5) whether the conditions in which the sample
was kept might affect the results of the genetic testing.  Indeed, as to
Jackson’s purported sample, the Identigene Report states that the collection
date is “N/A” and the date Identigene received the sample was October 5, 2006,
more than four years after Jackson’s death.  The Identigene Report does not facially
establish the Defendants’ right to judgment as a matter of law.

Attempting to address some of these issues, the
Defendants attached to their summary-judgment reply (1) an affidavit from a
toxicologist at the Harris County Medical Examiner’s Office regarding the
taking of blood samples from Jackson’s body during the autopsy and the custody
of these samples and (2) an affidavit from another person at the Harris County
Medical Examiner’s Office regarding the preparation of a blood card that was given
to Identigene for testing.  In addition, Identigene filed the Gahn Affidavit under
seal with the trial court.  However, all of this evidence was filed in October
2006, more than a month after the submission date for the Third Motion.  This
submission date was not reset, and the trial court never granted leave for the
Defendants to file late summary-judgment evidence.  Therefore, we cannot
consider these three late-filed affidavits on appeal.  See Tex. R. Civ. P. 166a(c); Benchmark
Bank v. Crowder, 919 S.W.2d 657, 663 (Tex. 1996).   

As to the no-evidence ground, Transcontinental
submitted the following evidence:

·       
At a hearing before the Texas Workers’ Compensation Commission,
Love testified that (1) she lived with Jackson; (2) she was Jackson’s
common-law wife; (3) Jackson is the Child’s father; (4) Jackson made
representations to various friends and her doctor that Jackson was the Child’s
father; (5) Love tried to list Jackson as the father on the Child’s birth
certificate but could not do so because his signature is required to list him
on the birth certificate and he died before the Child was born; and (6) there is
nobody else who could be the father of the Child.[3]

·       
An affidavit from Mardis, in which he states that (1) Jackson had
talked for weeks before his death above the impending birth of his baby;  (2)
Jackson had been approved to take off work the day of the expected delivery so
that he could be at the hospital for the birth; (3) Jackson told “everybody”
that he and Love were expecting a baby.

·       
Statements from two people that Jackson told them that Jackson
was the father of Love’s baby.  

Considering all the
summary-judgment evidence in the light most favorable to Transcontinental,
crediting evidence favorable to Transcontinental if reasonable jurors could,
and disregarding contrary evidence unless reasonable jurors could not, we
conclude that a reasonable and fair-minded juror could form a firm belief or
conviction that Jackson was the biological father of the Child.  See Sw.
Bell Tel. Co. v. Garza, 164 S.W.3d 607, 625–27 (Tex. 2004) (setting out
general standard of review for legal-sufficiency issues involving
clear-and-convincing burden of proof); Garza, 768 S.W.2d at 276 (holding
that there was a fact issue as to whether decedent was the father of a child
born after the decedent’s death, in wrongful-death case).  Because the evidence
raises a genuine fact issue in this regard, the Defendants were not entitled to
judgment as a matter of law against Transcontinental, and the trial court erred
in granting the Third Motion.[4]
 We sustain the fifth issue as to Transcontinental’s claims.

V.  Conclusion

Because Love did not file a response in opposition to
the First Motion, the trial court did not err in granting summary judgment as
to Love’s claims.  All of the objections to form asserted against the
summary-judgment evidence were waived when the parties failed to obtain a
ruling on the objections in the trial court.  Genuine fact issues exist as to
all of the no-evidence elements attacked in the First Motion and as to three of
the subsections of section 82.003(a) of the Texas Civil Practice and Remedies
Code, precluding summary judgment based on the Second Motion.  A genuine issue
of material fact precludes summary judgment as to whether Jackson was the
father of the Child.  The trial court erred in granting all of the
summary-judgment motions as to Transcontinental.[5] 





Accordingly, we affirm the trial court’s judgment as
to all of Love’s claims, reverse the judgment as to all of Transcontinental’s
claims, and remand Transcontinental’s claims for further proceedings consistent
with this opinion.

 

                                                                                    

                                                                        /s/        Kem
Thompson Frost

                                                                                    Justice

 

Panel consists of Justices Frost, Boyce, and Sullivan.  









[1] Though
Transcontinental has not preserved error as to the trial court’s failure to
sustain these evidentiary objections, this does not prevent Transcontinental
from pointing out on appeal objections to summary-judgment evidence that can be
raised for the first time on appeal, for example that statements in the 
evidence are conclusory.  See Choice, 222 S.W.3d at 838.





[2]  The
Defendants again argue various objections to form regarding Transcontinental’s
evidence in response to the Second Motion.  As discussed above with respect to
the First Motion, these objections have been waived.  See Choice, 222
S.W.3d at 838; Dolcefino, 19 S.W.3d at 926–27.   





[3]  We presume
for the purposes of our analysis that the determination by the Texas Workers’
Compensation Commision that Jackson is the Child’s father is not binding on the
Defendants in this case.





[4]  The
Defendants again argue objections to form regarding Transcontinental’s evidence
in response to the Third Motion.  As discussed above in connection with the
First Motion, these objections have been waived.  See Choice, 222 S.W.3d
at 838; Dolcefino, 19 S.W.3d at 926–27.   





[5]  Even
though the record reflects that, technically, the trial court granted summary
judgment more than ten months after “trial” began, no significant trial
proceedings had begun, and, in any event, trial courts can grant summary
judgment during trial.  See Sandhu v. Pinglia Invests. of Tex., No.
14-08-00184-CV, 2009 WL 1795032, at *2 (Tex. App.—Houston [14th Dist.] June 25,
2009, pet. denied) (mem. op.).